**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Cr. No. 23-69** |
| | ) | |
| **JEFFREY MCLAUGHLIN** | ) | |

**Opinion and Order on Motion to Suppress Statement**

Mr. McLaughlin is charged in a six-count Indictment with Distribution of Material Depicting the Sexual Exploitation of a Minor[1] (Count One), Production and Attempted Production of Material Depicting the Sexual Exploitation of a Minor[2] (Count Four), Possession of Material Depicting the Sexual Exploitation of a Minor[3] (Count Six), and three counts of Coercion and Enticement and Attempted Coercion and Enticement of a Minor to Engage in Illegal Sexual Activity[4] (Counts Two, Three, and Six). ECF No. 1.

Presently before the Court is Defendant Jeffrey McLaughlin's Motion to Suppress Statement. ECF No. 40. The government has filed a Response to the Motion. Omnibus Resp., ECF No. 50, at 17-28.[5] Both sides have submitted a video taken with a Body Cam worn by an Allegheny County Detective who, along with other law enforcement officers, was involved in the execution of a search warrant for Mr. McLaughlin's person and a search warrant for his house. After careful review of the briefs and the video of the encounter, the Motion will be denied.[6]

---

[1] 8 U.S.C. §§ 2252(a)(2) and 2252(b)(1).
[2] 18 U.S.C §§ 2251(a) and 2251(e).
[3] 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2).
[4] 18 U.S.C. § 2422(b).
[5] Mr. McLaughlin filed seven pretrial motions, to which the government filed an Omnibus Response.
[6] Pursuant to Federal Rule of Criminal Procedure 12(c)(1) a District Court "may [ ] schedule a motion hearing" on a motion to suppress. Fed. R. Crim. Proc. 12(c)(1). Mr. McLaughlin has not requested a hearing. The Court finds that, with the benefit of the two-hour long body cam video of the encounter that captures all essential issues, as well as the parties' briefs, a hearing is not necessary. *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010).

## I. Background

Mr. McLaughlin argues that he was in custody when questioned by law enforcement, without having received the required procedural safeguards pursuant to *Miranda v. Arizona*. A brief description of the investigations, leading to the issuance and execution of the search warrants is set forth below, followed by a detailed description of law enforcement's encounter with Mr. McLaughlin, as captured by the Body Camera.

***Buffalo Investigation***

In November 2021, the FBI in Buffalo, New York, executed a search warrant for a Facebook account, "timmy.adams.54738," with a username of "Timmy Adams." The Facebook search warrant arose out of allegations of possible online sexual exploitation of a minor, initially reported to an Investigator with the Erie County Sheriff's Office in New York. The information was provided by the victim's twelve-year-old twin sister. The Sheriff's Investigator relayed the information to the FBI in Buffalo, New York, who, after an initial investigation, submitted an administrative subpoena for the Facebook account. Through the information received from the administrative subpoena, the FBI learned that the Facebook account was associated with telephone number 412-403-1573. Investigation of public sources revealed that that telephone number was associated with a Jeffrey Allen McLaughlin II, date of birth of March 5, 1982, and an address of 521 Vermont Avenue, Glassport, Pennsylvania. The FBI also discovered that Jeffrey McLaughlin was the subscriber for the cellular phone service associated with phone number, 412-403-1573. The cellular phone account was also linked to the address, 521 Vermont Avenue, Glassport, Pennsylvania.

New York law enforcement corroborated the information received from the victim's sister, in part, through interviews with the victim, the sister, and the victim's mother. After

gaining permission from the victim's mother to use the victim's Facebook account, an Online Covert Employee engaged in conversations with the user of the Timmy Adams Facebook account. The investigation eventually led the FBI to apply for a search warrant for the contents of the timmy.adams.54738 Facebook account. The affiant of the Facebook Affidavit, Special Agent Garver, averred that the interviews of the victim and her sister, the covert interactions with "Timmy Adams," Special Agent Garver's knowledge, training, and experience, as well as additional averments, demonstrates probable cause to believe that the user of Facebook account timmy.adams.54738 had engaged in violations of 18 U.S.C. § 2251(a), 2251(e) (production and attempted production of child pornography; 18 U.S.C. § 2252A(a)(5)(B) (production and attempted production of child pornography); and 18 U.S.C. § 2423(a) (sexual enticement of a minor), and that evidence of said violations would be found through a search of the Facebook account. Once the Facebook information was obtained, law enforcement discovered a conversation between the user of the timmy.adams.54738 Facebook account and a different minor victim that took place between August 1, 2021 and November 22, 2021. Said interactions include evidence of the sexual exploitation of a minor.

***Pittsburgh Investigation***

The investigation of the matter was passed to the Pittsburgh FBI Field Office because Jeffrey McLaughlin resided in the Western District of Pennsylvania. As part of the Pittsburgh FBI's investigation an online covert employee was utilized to interact with Timmy Adams. Said interactions again revealed evidence of child sexual exploitation. As a result of law enforcement's investigations in Buffalo and Pittsburgh, search warrants were obtained to search Mr. McLaughlin's person and to search his house. At the time the FBI applied for the search warrants, the FBI was aware that Mr. McLaughlin had moved from 521 Vermont Avenue,

Glassport, Pennsylvania, to a new residence at 835 St. Clair Avenue, Clairton, Pennsylvania, which was the subject residence of the search warrant. Both warrants were executed on July 28, 2022.

***Execution of Search Warrants***

The stop and execution of the warrant to search Mr. McLaughlin's person was conducted by Detectives Steven Dish and Scott Klobchar of the Allegheny County Police Department, and Officer James Aston of the Allegheny County Adult Probation Department. The officers drove an unmarked vehicle. Neither Detective wore a law enforcement uniform nor did their clothing contain any indication that they were law enforcement. Officer Aston, who presumably Mr. McLaughlin knew was a Probation Officer, wore a long-sleeve shirt that had a Probation Officer badge or patch as part of the shirt. Officer Aston wore a utility belt around his waist that held a firearm, handcuffs, and a few other items. All three officers appear to be wearing protective vests.

The encounter was captured by a body camera worn by Detective Dish. Body Cam Video, July 28, 2022, Ex. 1 (submitted by both parties). The video captures the initial encounter with Mr. McLaughlin at his workplace parking lot. From there, the video captures the drive from Mr. McLaughlin's workplace to his house. Once at the house, law enforcement engaged in conversations with Mr. McLaughlin outside his residence, while waiting for the search team to let them know it was clear to enter. Inside the residence, Detective Dish interviews Mr. McLaughlin in an upstairs bedroom with Detective Klobchar present. The video of the encounter is approximately two hours, with most of the relevant material being completed within one and a half hours.

***Initial Encounter in the Parking Lot***

Detective Dish turned his body camera on while his vehicle was parked just outside Mr. McLaughlin's workplace. After the camera was activated, the officers observed the car in which Mr. McLaughlin was a passenger pull into the parking lot. Mr. McLaughlin's girlfriend was driving. All three officers approached the vehicle as the car doors were being opened. Detective Klobchar and Officer Aston approached Mr. McLaughlin on the passenger side of the vehicle while Detective Dish approached Mr. McLaughlin's girlfriend.

Detective Klobchar immediately told Mr. McLaughlin, "Jeff, you're not under arrest." Body Cam Video 1:15. As Detective Dish approached Mr. McLaughlin's girlfriend, she asked, "what's going on?" and Detective Dish responded, "We just need to talk to him for a minute, okay? He's on probation, we're doing a probation check." *Id.* 1:20-1:22. Detective Klobuchar again tells Mr. McLaughlin, "You're not under arrest," and then he says, "We have a search warrant." *Id.* 1:27-1:30. Detective Klobchar conducts a search of Mr. McLaughlin's person. After the search, which took approximately one minute, Detective Klobchar can be heard explaining that the officers have another search warrant for his house, and that "there are agents back at the house." *Id.* 2:23-2:38. He then tells Mr. McLaughlin, "You're not being detained. You are free to go. You don't have to go back if you don't want to, but we are going to go back and get into the house one way or another." *Id.* 2:41-2:47. Without hesitation, Mr. McLaughlin agrees to go back to his house with the officers. Detective Dish and Mr. McLaughlin also inform Mr. McLaughlin's boss that he will be leaving with the officers.

Before they leave, Mr. McLaughlin has a cigarette and Detective Dish asks him if he has a house key, "so they don't have to blow your door off the hinges, they're out the house with a search warrant, we'll tell then to wait till we get there with the key." *Id.* 5:21-5:28. Mr. McLaughlin again says he will ride with the officers to his house. *Id.* 5:30. Detective Dish asks

him, "Do you want to ride with us, you want to go with [your girlfriend], how you want to go, it's up to you." *Id.* 5:39-5:43. Mr. McLaughlin again says he will go with the officers, stating that Detective Klobchar had told Mr. McLaughlin he would explain things to him on the drive.

***Drive to the House***

On the drive to the house, Mr. McLaughlin sat in the back seat next to Officer Aston. Detective Dish drove and Detective Klobchar sat in the passenger seat. As the car started driving, Detective Klobchar explained to Mr. McLaughlin that they had two search warrants, one for his person (which they had already executed), and one for his house. Then Officer Aston tells Mr. McLaughlin that he is going to go through his cell phone, with Mr. McLaughlin indicating he understood. Officer Aston can be heard asking Mr. McLaughlin questions about the phone with Mr. McLaughlin answering. Detective Dish asked Mr. McLaughlin if there were any electronic devices in the house, to which Mr. McLaughlin stated that he had a cell phone that did not work and his fiancé's father's computer, which also did not work. Detective Dish also told him that the agents executing the search warrant will want Mr. McLaughlin and his girlfriend to stay outside of the house while they check for other people in the house. Detective Dish then asks Mr. McLaughlin, "Maybe while they're searching, we can sit down and talk a little bit about the warrant and stuff and why we're here. Okay? You good with that?" to which Mr. McLaughlin says, "yeah." *Id.* 29:33-29:34. Officer Aston then explains that possible violations of probation might occur if he has electronic devices that probation is not aware of. Detective Dish also asks Mr. McLaughlin if there is a place in his house where they could talk privately. They arrived at the house at approximately 9:35 A.M.

***Outside the House***

Outside the house, Detective Dish directs Mr. McLaughlin to "stay back here a minute" as Mr. McLaughlin was walking on the sidewalk heading towards the front of his house. *Id.*

30:24. Then again, as Mr. McLaughlin is talking to Detective Dish, the Detective directs Mr. McLaughlin to step back, indicating that he step back from walking in front of his driveway. *Id.* 30:35.

Just after the search team enters the house, Detective Klobchar says to Mr. McLaughlin: "So, we explained to you already, but I'm just going to keep reiterating," you're not being detained, you're free to leave, "you understood all that, correct?" *Id.* 32:15-3:22. To which Mr. McLaughlin says, "yeah." *Id.* 32:22. Detective Dick then says, "we're going to talk to you . . . we're going to ask you questions. If you don't want to answer the questions, you don't have to." *Id.* 32:24-32:35. Detective Dish reiterates to Mr. McLaughlin, "You don't have to answer any questions, you don't have to talk to us." *Id.* 32:43-33:45. Detective Dish then tells Mr. McLaughlin, "I'm just going to read this to you, because we're in contact with you," and then proceeds to read Mr. McLaughlin his *Miranda* rights. *Id.* 32:49-33:10. Detective Dish follows this up by saying, "So basically, you're not under arrest, you don't have to talk to us, you don't have to answer questions." *Id.* 33:11-32:14. Detective Dish further explains, "If I ask you a question and you don't want to answer it, just say 'Steve, I don't want to answer that question,' alright? you don't have to say a word." *Id.* 33:17-33:19. The Detective then tells Mr. McLaughlin that they would like to talk to him about the search warrant and ask him questions, if he doesn't want to answer the questions he doesn't have to, after which Detective Dish asks, "are you good with that?" *Id.* 33:25-33:30. Mr. McLaughlin nods his head and says, "yeah." *Id.* 33:34.

At this time, Mr. McLaughlin and his girlfriend are sitting on a retaining wall outside his house, while Detecting Dish, Detective Klobchar, and Officer Aston stand on the sidewalk around them. Officer Aston briefly wanders up the driveway towards the garage. Detective

Dish also walks away from the group, towards the house, to check with the search team to see if the house was clear yet. Detective Dish also speaks with some of the agents. The group consisting of Mr. McLaughlin, his girlfriend, Officer Aston, Deceive Klobchar, and Detective Dish, then engaged in casual conversation outside the house while they waited for the search team to indicate that they could enter. Once again, Detective Dish walks away from the retaining wall where Mr. McLaughlin and his girlfriend were sitting to check to see if the house was clear. Officer Aston also walked away from where they were sitting on the retaining wall. When Detective Dish gets the all-clear to enter the house, he asks Detective Klobchar to take Mr. McLaughlin upstairs. *Id.* 46:36-46:38. Detective Klobchar first walks away from Mr. McLaughlin and his girlfriend, leaving Mr. McLaughlin and his girlfriend alone on the wall for a few moments. Eventually, both Mr. McLaughlin and his girlfriend enter the house, but before they do, Detective Dish, says, "Neither of you are detained here, but we are going to restrict your movement for our safety." *Id.* 47:00-47:01.

***Inside the House***

Detective Dish and Detective Klobchar interviewed Mr. McLaughlin in an upstairs bedroom. After they entered bedroom, Detective Dish says, "Just to remind you, you don't have to answer anything." *Id.* 48:18-48:21. Mr. McLaughlin sat on the bed and Detective Dish interviewed him. Shortly after questioning began, Mr. McLaughlin revealed that he had been going online and that he had an iPhone in the kitchen with which he chatted with others online. He tells the Detectives where the iPhone is specifically located in the kitchen, and he provides the passcode to the phone. Detective Dish leaves the bedroom to tell the other agents about the location of the phone and its passcode so they could retrieve it and review its contents. As the interview progressed, Mr. McLaughlin made several inculpatory and incriminating statements. At one point, the interview was paused and both Detective Dish and Detective Klobchar left the

bedroom, leaving Mr. McLaughlin alone. Eventually, Mr. McLaughlin was permitted to come downstairs and speak with his girlfriend. The two of them sat on the living room couch and talked with each other and sometimes talked with one of the officers. While Mr. McLaughlin was seated on the couch, Detective Dish asked Mr. McLaughlin:

> **Det. Dish**: How have we treated you today since we come in contact with you?
> **Mr. McLaughlin**: Perfectly fine.
> **Det. Dish**: Did we coerce you . . . did you talk to us voluntarily?
> **Mr. McLaughlin**: Yeah.

*Id.* 1:30.10-1:30:22.

**II. Applicable Law**

Mr. McLaughlin seeks to suppress the statements he made during the encounter as statements obtained during a custodial interrogation in violation of the Fifth Amendment to the United States Constitution and his rights articulated in *Miranda v. Arizona*, 384 U.S. 438 (1966). He also asserts that he was unlawfully detained when he was surrounded by law enforcement outside his house and told not to move, in violation of the Fourth Amendment to the United States Constitution.

The Fifth Amendment to the United States Constitution provides that all criminal defendants have a privilege against self-incrimination. U.S. Const. Amend. V. Pursuant to *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogations of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. 384 U.S. 438, 444 (1966). A custodial interrogation consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The "procedural safeguards"

referred to by the Supreme Court are the requirement that law enforcement read inform a person of his now familiar *Miranda* rights. *Id.*

Generally, law enforcement officers are only required to *Mirandize* a person that is "in custody." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006). "A person is in custody when he either is arrested formally or his freedom of movement is restricted to 'the degree associated with a formal arrest.'" *Id.* (quoting *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (citation and internal quotation marks omitted)). "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *Willaman*, 437 F.3d at 359 (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974). When determining if a person who has not been formally arrested is "in custody," a court is to consider the following non-exhaustive factors:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359-60. *See also United States v. King*, 604 F.3d 125 (3d Cir. 2010) (same)).

**III. Discussion**

In examining each of the five *Willaman* factors with the facts of this case, and considering the totality of the circumstances, the Court concludes that Mr. McLaughlin was not in custody at any time during his encounter with law enforcement. Therefore, there is no

*Miranda* violation.[7]

**(1) Whether the officers told the suspect he was under arrest or free to leave**

Upon law enforcement's first encounter with Mr. McLaughlin, Detective Klobchar immediately told him he was not under arrest. Approximately fifteen seconds later he repeats to Mr. McLaughlin that he is not under arrest. Detective Klobchar then tells Mr. McLaughlin that they have a search warrant, after which he searched Mr. McLaughlin. When the search of Mr. McLaughlin was completed, Detective Klobchar tells Mr. McLaughlin that they also have a search warrant for his house and that there are agents at the house. Detective Klobchar tells Mr. McLaughlin that he is not being detained, that he is free to go, and that he does not have to go back to his house. The Detective further explains that the search team is going to conduct a search of his house whether Mr. McLaughlin came back to the house or not. In response, Mr. McLaughlin says he will come back to the house, and he also voluntarily agreed to ride with the officers instead of driving with his girlfriend.

Outside of Mr. McLaughlin's house, Detective Dish repeats to Mr. McLaughlin that he is not being detained and that he is free to leave. Detective Dish then tells Mr. McLaughlin that the officers are going to ask him questions and if he doesn't want to answer the questions, he doesn't have to answer. Detective Dick reiterates to Mr. McLaughlin that he doesn't have to answer any questions, and that Mr. McLaughlin also does not have to talk to with the officers. Detective Dick reads Mr. McLaughlin his *Miranda* rights. Detective Dick repeats to Mr. McLaughlin that he is not under arrest, he does not have to talk with the officers, and he does not have to answer any questions. Detective Dick specifically explains to Mr. McLaughlin that if Detective Dick asks him a question he does not want to answer, Mr. McLaughlin can tell him. "I don't want to

[7] Of course, Mr. McLaughlin is given his *Miranda* rights as he sat on the retaining wall outside of his house and before he is interviewed.

answer that question." Thus, all evidence clearly demonstrates that the officers told Mr. McLaughlin that he was not under arrest, that he was free to go, and that he did not have to answer any questions.

**(2) The location or physical surroundings of the interrogation**

***Workplace Parking Lot***

No interrogation occurred during the initial encounter in the parking lot or on the drive from the parking lot to the house. Nonetheless, to the extent it is relevant, the location and physical surroundings of the workplace parking lot were unexceptional. The location was familiar to Mr. McLaughlin, and although any person might experience some degree of surprise and nervousness when unexpectedly approached by three law enforcement officers, Mr. McLaughlin was immediately told he was not under arrest and none of the officers attempted to interrogate him about the subject matter of the search warrant. The officers also did not restrict Mr. McLaughlin's or his girlfriend's movement in the parking lot.

***Drive to the House***

During the drive from the parking lot to Mr. McLaughlin's house, Mr. McLaughlin was asked minimal questions. The minimal questions asked were primarily concerned with whether Mr. McLaughlin had additional electronic devices in his home. Mr. McLaughlin did answer the questions, but even if he had exercised his right not to answer the questions posed by the Detective, it is likely that Officer Aston would have lawfully asked the questions anyway, as such questions go directly to Mr. McLaughlin's probation restrictions on use of devices and the internet. With that in mind, Officer Aston's own questions, and his review of Mr. McLaughlin's cell phone, were permitted as actions taken by a supervising Probation Officer. Traveling in a confined vehicle with three law enforcement officers might be considered coercive under

different circumstances. Here, however, Mr. McLaughlin voluntarily agreed to ride with the officers and answer questions, there was no coercive conduct by the officers. Thus, the location and physical surroundings of the drive from the parking lot to the house were innocuous under the second factor.

***Outside the House***

Next, Mr. McLaughlin arrived at his house where he first stood on the sidewalk. Detective Dick asked Mr. McLaughlin questions about where his girlfriend was because she was expected to provide the code for entering the house. While responding to Detective Dish, Mr. McLaughlin began to walk towards Detective Dick. The path Mr. McLaughlin took towards the Detective necessarily meant that he was about to cross in front of his driveway, towards his house. Therefore, in a neutral tone, Detective Dick told Mr. McLaughlin to "stay over here," a command not uncommon when a search warrant of someone's house is about to be executed, and officers are concerned with officer safety and the integrity of the search. Later, Mr. McLaughlin was again directed away from walking towards the house. Eventually, Mr. McLaughlin and his girlfriend sat on the retaining wall next to Mr. McLaughlin's driveway. For most of the time they are outside, Detective Dick, Detective Klobchar, and Officer Aston stand on the sidewalk facing Mr. McLaughlin and his girlfriend. It is possible that a person sitting on a retaining wall, in close proximity to three officers, while a team of federal agents search their house, would feel that the physical circumstances are coercive to the extent that they would not feel free to leave. Here, however, none of the officers demanded that Mr. McLaughlin or his girlfriend return to his house. Mr. McLaughlin and his girlfriend voluntarily agreed to return to the house and chose to sit on the retaining wall, all while knowing that they were not permitted to enter the house while the search was active. Mr. McLaughlin engaged in primarily casual conversations with the

officers. The three officers stood at an appropriate social distance from Mr. McLaughlin and his girlfriend, and at times one or the other of the officers would drift away to engage with the search team. Just before Mr. McLaughlin entered his home, all three officers had walked away from the retaining wall, leaving Mr. McLaughlin and his girlfriend alone for a short moment. Mr. McLaughlin was not obstructed from leaving, nor did he ask to leave only to have his request denied. The location and physical surroundings outside of Mr. McLaughlin's house do not suggest indicia of being in custody.

***Inside the House***

When Mr. McLaughlin was about to enter his house, he was told that his movement was going to be restricted for the officer's safety. A member of the search team suggested to Detective Dick that an upstairs bedroom was a good place to talk to Mr. McLaughlin, and so that is where the interview took place. The bedroom was relatively small and had a single door for entering and exiting. The door was kept open during the entire time of the interview. Neither of the Detectives stood in front of the door or otherwise physically restricted Mr. McLaughlin from leaving. Moreover, Mr. McLaughlin appeared to be at ease and comfortable in this room, as he sat, and sometimes leaned back, on the bed. Again, there is no evidence that Mr. McLaughlin was obstructed from leaving, he did not ask to leave, and he appeared to answer Detective Dish's questions voluntarily and politely. The location and physical surroundings in Mr. McLaughlin's bedroom also do not suggest indicia of being in custody.

**(3) The length of the interrogation**

The third factor does not weigh in favor of Mr. McLaughlin. The length of the video was roughly two hours, while the interview portion took approximately forty-two minutes. The actual question and answer portion is slightly less than forty-two minutes, as there were times

when Detective Dish left the room to talk to other officers, and the interview was paused until he returned. The minimal length of the interrogation leans in favor of finding that Mr. McLaughlin was not in custody.

**(4) Whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement**

Fourth, with respect to any coercive tactics employed by the officers, this factor weighs in favor of the government. Throughout the entire video, no officer physically restrained Mr. McLaughlin, used a hostile tone of voice, drew a weapon, or referred to the use of a weapon. Detectives Dish and Klobchar wore street clothes. Officer Aston's attire included a sewn-on Probation Officer badge on his shirt, and he did carry a visible firearm and handcuffs around his waist. The agents executing the search wore protective vests and their attire indicated that they were "FBI." The search team members, however, had little to no contact with Mr. McLaughlin and his girlfriend. Mr. McLaughlin was offered the opportunity to smoke a cigarette and his girlfriend was permitted to use the restroom. When Mr. McLaughlin sat on the bed during questioning, Detective Dish and Detective Klobchar positioned themselves to either side of the door, but not directly in front of the doorway, and neither of them positioned themselves in a manner so as to indicate that Mr. McLaughlin was not free to leave. While questioning Mr. McLaughlin, the Detectives did not display a firearm. The Detectives appear to have taken up their positions based on the layout of the small bedroom, rather than to confine Mr. McLaughlin in the room against his will. Thus, the evidence does not show that the Detectives used hostile tones of voice, displayed weapons, or physically restrained Mr. McLaughlin.

**(5) Whether the suspect voluntarily submitted to questioning**

Finally, with respect to whether Mr. McLaughlin voluntarily submitted to questioning, it is abundantly clear that Mr. McLaughlin voluntarily agreed to the interview and continued to

voluntarily engage with the Detectives before, during, and after the questioning. Detective Dick or Detective Klobchar repeatedly informed Mr. McLaughlin that he was not under arrest, that he was free to leave, and that he did not have to answer questions. The logical conclusion to draw, considering all the circumstances, is that Mr. McLaughlin voluntarily submitted to questioning.

**IV. Fourth Amendment**

In addition, the Court finds that Mr. McLaughlin was not unlawfully detained by law enforcement outside of his house in violation of the Fourth Amendment. The circumstances present during the time Mr. McLaughlin was outside his house, as set forth above and incorporated herein, lead to the conclusion that Mr. McLaughlin was not illegally detained in violation of the Fourth Amendment. Detective Dick's verbal direction to Mr. McLaughlin to "stay over here," was given in support of maintaining the integrity of the ongoing search of the house and for the safety of law enforcement. The direction was delivered in a neutral tone, with no show of weapons, and no physical contact with Mr. McLaughlin himself. While he was outside, Mr. McLaughlin was never told he could not leave, and no officer obstructed his ability to walk away. Thus, the Court finds no Fourth Amendment violation occurred outside the house.

**V. Conclusion**

Mr. McLaughlin was not in custody and any time during his encounter with law enforcement. He voluntarily agreed to be interviewed. The interview took place at his own house. The search team decided that the location of the interview would be in the bedroom. Mr. McLaughlin was told several times that he was not under arrest and that he was free to leave at any time. Mr. McLaughlin was told from the beginning that he did not have to come back to his house while the search warrant was being executed. Furthermore, he was repeatedly told that he did not have to answer any questions, with Detective Dick specifically telling him that if he does

not want to answer a specific question, he is free to tell him "Steve, I don't want to answer that question." The Court finds that, under the circumstances present here, a reasonable person would feel free to end the questioning and leave. Therefore, the Court finds that Mr. McLaughlin was not in custody.

Considering the factual circumstances of Mr. McLaughlin's presence outside his house, and the Court's conclusion that such do not indicate that Mr. McLaughlin was in custody, the Court finds that suppression is not warranted based on Mr. McLaughlin's assertion that he was illegally detained while outside of his house in violation of the Fourth Amendment.

Accordingly, Mr. McLaughlin's Motion to Suppress Statement will be denied.

**ORDER**

AND NOW, this 10th day of April 2024 it is hereby ORDERED that Defendant Jeffrey McLaughlin's Motion to Suppress Statement (ECF No. 40) is DENIED.

Marilyn J. Horan
United States District Judge